Kevin W. Weber
Michael D. DeLoreto
Julia E. Browning
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102-5310
(973) 596-4500
*Attorneys for Plaintiff*
*Standardbred Breeders and Owners Association of New Jersey*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| STANDARDBRED BREEDERS AND OWNERS ASSOCIATION OF NEW JERSEY,<br><br>              Plaintiff,<br><br>v.<br><br>FR PARK RACING L.P.; and PLAYUP INTERACTIVE, INC.,<br><br>              Defendant. | Civil Action No.:   24-cv-09515<br><br>*Document Filed Electronically*<br><br>__COMPLAINT__ |

Plaintiff Standardbred Breeders and Owners Association of New Jersey ("Plaintiff" or "SBOANJ") by and through its counsel, Gibbons P.C., for its Complaint against FR Park Racing L.P. ("FR Park Racing"), and PlayUp Interactive, Inc. ("PlayUp") (collectively "Defendants"), hereby alleges as follows:

### PRELIMINARY STATEMENT

1.       Freehold Raceway, one of just three horse racetracks in New Jersey, is a vital part of the state's economy and culture, providing jobs, revenue, entertainment, and tourism.

2.       The relationship between a racetrack and its local horsemen group is a critical part of their interdependency —the horsemen provide the racetrack a product to sell and the racetrack provides the horsemen the ability to compete.

3.      To that end, both federal and state law afford various statutory protections to the local horsemen group, in this case the SBOANJ, and require the racetrack operator to enter into various contracts with the horsemen.

4.      The SBOANJ has various agreements with FR Park Racing, including an Operations Agreement for Freehold Raceway that runs through June 2025, and a Revenue Sharing Agreement as to sports wagering that runs through 2029 (both defined further herein).

5.      As discussed below, FR Park Racing has treated the SBOANJ with bad faith, violating federal and state law, and breaching both agreements.

6.      FR Park Racing has allowed Freehold Raceway to fall into a state of dangerous disrepair, in violation of the Operations Agreement.

7.      This summer, FR Park Racing abandoned sports wagering at Freehold Raceway and moved its associated online sports wagering operations to a casino partner in order to avoid sharing revenue with SBOANJ, or reinvesting sports wagering revenue into Freehold Raceway.

8.      Now, and despite FR Park Racing's contractual obligations effective through June 30, 2025 and the SBOANJ's and others reliance upon the Operations Agreement to schedule races for January through June 2025, FR Park Racing seeks to abandon the Operations Agreement and close down *all operations* at Freehold Raceway, effective December 28, 2024.

9.      This action seeks to hold FR Park Racing accountable for its bad faith actions, and to force it to abide by the letter and spirit of the laws and statutorily required contracts that exist for the benefit of the horsemen.

## THE PARTIES

10.      Plaintiff Standardbred Breeders and Owners Association of New Jersey is a corporation organized under the laws of New Jersey, with its principal place of business at 64

Business Route 33, Manalapan, New Jersey 07726.

11.     According to the SBOANJ website, its membership is comprised of "horse breeders, drivers, trainers, owners, and backstretch personnel, active and interested in the Standardbred industry in the State of New Jersey."  The SBOANJ has associational standing to bring this action.

12.     First, SBOANJ's members have standing to bring this action in their own right because violations of the Operations Agreement and the Revenue Sharing Agreement, as well as closure of the Freehold Raceway, directly affect each member individually.

13.     Second, the interests that the SBOANJ seeks to protect are germane to the purpose of the organization.  Each of Defendants' violations directly affect the Standardbred racing industry and enforcing the terms of the Operations Agreement and the Revenue Sharing Agreement are germane to the SBOANJ's purpose, which includes promoting the popularity of Standardbred racing in New Jersey and providing high quality racing facilities.  Similarly, closing Freehold Raceway would obstruct the SBOANJ from fulfilling its purpose by reducing the locations where Standardbred racing can occur.

14.     Lastly, neither the claims asserted nor the relief sought in this litigation require the participation of individual members.  The SBOANJ seeks injunctive relief, specific performance, an accounting, and damages to the association as a whole for Defendants' failure to maintain the racetrack, share revenue, and keep the raceway operational, in accordance with its contractual obligations and the SBOANJ's reliance on the same.

15.     Defendant FR Park Racing L.P. is New Jersey limited partnership. Upon information and belief, its members are Pennwood Racing, Inc. and Greenwood Racing, Inc. Pennwood Racing, Inc. is a Pennsylvania corporation with its principal place of business in

Pennsylvania. Greenwood Racing, Inc. is a Delaware corporation with a principal place of business in Pennsylvania.

16.    Upon information and belief, defendant PlayUp is a Delaware corporation, with a principal place of business in Henderson, Nevada.

## JURISDICTION AND VENUE

17.    This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332, because there is complete diversity of citizenship between plaintiff and defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

18.    Venue is proper in the United States District Court for the District of New Jersey pursuant to 28 U.S.C. §1391(b) because SBOANJ resides and operates in this District, and otherwise conducts business in this District.

## BACKGROUND

A.    *FR Park Racing's Operation of Freehold Raceway*

19.    Freehold Raceway began operating in 1853 and is the oldest still-operating racetrack in the United States.  Freehold Raceway and the Meadowlands are the only tracks in New Jersey to feature live Standardbred harness racing.

20.    Standardbred racing is an important part of New Jersey's economy.  In 2021, for example, the Standardbred racing industry had a $296.9 million annual economic impact on the State of New Jersey, supporting 1,890 jobs with $91.9 million in employee compensation and $41 million in tax revenues to the State of New Jersey.

21.    FR Park Racing purchased Freehold Raceway in 1999.

22.    Federal and State law require the racetrack operator to have various agreements with the local horsemen group.

23.    For example, the Interstate Horseracing Act, 15 U.S.C. 3001, gives powerful rights to the local "horsemen's group," defined as "the group which represents the majority of owners and trainers racing [at a particular racetrack], for the races subject to the interstate off-track wager on any racing day." 15 U.S.C. 3002(12).  Under federal law, a "racing association" (i.e., a licensed racetrack) must have "a written agreement with the horsemen's group" in order to accept an interstate off-track wager.  15 U.S.C. 3004(a)(1)(A).

24.    Similarly, New Jersey law requires racetrack operators to obtain the consent of the local horsemen's group for intertrack wagering.  N.J.S.A. 5:5-112.

25.    And, moreover, the permit holder at Freehold Raceway must obtain "written consent from the Standardbred Breeders' and Owners' Association of New Jersey" in order to run less than 192 Standardbred race dates (but never less than 75).  N.J.S.A. 5:5-156.

26.    Federal and State law, therefore, requires the racetrack operator and local horsemen's group to work cooperatively as partners for the betterment of the industry.  As described below, FR Park Racing failed to hold up its end of the bargain.

27.    On December 22, 2022, the SBOANJ and FR Park Racing entered into an Operations Agreement to govern maintenance and other administrative aspects related to Freehold Raceway (the "Operations Agreement").  The Operations Agreement has a term from December 22, 2022 through June 30, 2025, and copy of this agreement is attached hereto as Exhibit 1.

28.    The Operations Agreement includes provisions such as permitting the SBOANJ to audit the Horseman's Purse Account ("Purse Account") upon request to verify the accuracy of all deposits, debits, revenues, and expenses associated with the account.

29.    The Operations Agreement also provides that "[t]he Permit Holders agree to make reasonable attempts to make up any racing delays cancelled due to inclement weather, or any other

cause, to the best of their ability."

30.    Of most importance, however, is the Operations Agreement's primary purpose of "promoting the popularity of the sport of harness racing and ensuring the continuity of harness racing of high quality at racing facilities for the best interests of the Parties and the public."

31.    To ensure the quality of the racing facilities, the Operations Agreement required FR Park Racing to maintain certain physical conditions at the Freehold Raceway.

32.    Specifically, FR Park Racing must maintain the Freehold Raceway and, upon written notice by the SBOANJ, fix certain conditions within 72 hours.  Such conditions include: (1) a condition that adversely affects the integrity of the racetrack or racetrack facilities; (2) a hazardous or dangerous condition at the racetrack or racetrack facilities which would include adequate paddock parking area lighting; (3) a substandard condition existing at the racetrack which materially affects the ability to conduct live racing; and (4) any condition which affects the health and welfare of the horses.

33.    FR Park Racing and the SBOANJ frequently held in-person meetings at the racetrack to discuss the conditions and any other issues related to the operation of Freehold Raceway.

34.    Unfortunately, FR Park Racing rarely abided by the 72 hour requirement in the Operations Agreement.

35.    For example, on January 13, 2023, the SBOANJ sent an e-mail to FR Park Racing stating that there was contamination in the horse stalls and requesting signs and a portable toilet in the Lasix Barn area to help alleviate the problem.

36.    The contamination referenced in the e-mail was due to urination in the horse stalls, which is a safety concern for individuals and horses alike.

37.    FR Park Racing did not put the signs up nor install portable toilets until well after the 72 hour requirement in the Operations Agreement.

38.    Similarly on September 4, 2024, the SBOANJ sent an e-mail with photographs to FR Park Racing outlining the following concerns:

- Grandstand Area:
  - Main entrance sign still has Sportsbook on it;
  - Down Escalator now sealed off and broken for years needs to be fixed;
  - Route 33 street wall needs cleaning and painting;
  - Valet Parking Area sign states Lot Closed even though it was agreed on race day's that it would be opened from 11AM to 5PM;
  - Buildings outside and inside Valet area need cleaning and painting;
  - Garage doors need repair and painting;
  - All black top areas have grass growing and need removal; and
  - Car dealers continue to park inventory in parking lots.

- Paddock Area:
  - All parking areas and black top have grassing growing and need removal;
  - Photos show all barn and stall areas need repair and painting;
  - Parking areas need grass cut; and
  - General maintenance required in the paddock area.

39.    After FR Park Racing failed to respond, on September 12, 2024, the SBOANJ sent a follow-up email.

40.    As of today, FR Park Racing has failed to address these items.

41.    Further, the Operations Agreement required that the SBOANJ and FR Park Racing shall establish a joint committee to increase attendance, handle, racing quality, participation, and enhance public perception of Standardbred racing.

42.    The SBOANJ and FR Park agreed to contribute $25,000 to fund this committee, but due to FR Park's unwillingness to contribute the agreed upon funds, a joint committee was never formed.

43.    FR Park Racing has therefore breached the Operations Agreement, causing damage to the SBOANJ and its members.

44.      In this regard, FR Park Racing has left a number of safety issues unaddressed, including ensuring that there are adequate bathrooms in the paddock area at Freehold Raceway, that there is a working escalator, that the garage areas are clean and safe, and that the horse stalls are sufficiently safe for the animals.

45.      In addition to the growing number of safety concerns at Freehold Raceway due to FR Park Racing's negligence, the facility is generally in a state of disrepair.  Freehold Raceway boasts old signage with incorrect information, is in desperate need of a fresh coat of paint and overall cleaning service, and requires general maintenance to main areas of the facility including the paddock area parking lot and barn and stall areas, and grandstand area garage and main entrance.

46.      FR Park Racing's reluctance to maintain and update Freehold Raceway results in decreased attendance at races and lost revenue and profits for Freehold Raceway and the SBOANJ.

**B.  *History of Sports Wagering at Freehold Raceway***

47.      Following the 2018 United States Supreme Court decision declaring as unconstitutional the Professional and Amateur Sports Protection Act of 1992 (also known as PASPA) the New Jersey Legislature passed the New Jersey Sports Wagering Act, N.J.S.A. 5:12A-10 *et seq*. (the "Act").

48.      Various horsemen's groups and racetrack operators supported the Act, as one of its primary purposes was to offering of sports betting at the racetracks.

49.      The Legislature intended for sportsbooks at the racetracks to inject revenue into the horse racing industry by attracting more visitors for the benefit of all industry stakeholders.

50.      The Act also permits "[a] casino or racetrack that holds a sports wagering license [to] conduct an online sports pool . . . provided, however, that each sports wagering licensee may

provide no more than three individually branded websites, each of which may have an accompanying mobile application bearing the same brand as the website for an online sports pool, those websites and mobile applications." N.J.S.A. 5:12A-11(a).

51.    These online branded websites are also known as online "skins," which operate under a valid sports wagering license.

52.    Critically, "[n]o casino or racetrack shall be permitted to operate a sports pool or accept wagers via an online sports pool unless a sports wagering lounge is established and has commenced operation in its facility." N.J.S.A. 5:12A-11(a). This is known as the brick-and-mortar requirement.

53.    Further, the DGE regulations confirm that "no casino or racetrack licensee shall operate or accept wagers from either a sports pool or online sports pool, unless the licensee has commenced operation in a sports wagering lounge" N.J.A.C. 13:69N-1.2(b).

54.    On September 24, 2018, Senate Bill 2992 was introduced to, among other things, amend the Act and provide that a portion of sums received by the horse racing permit holder from sports wagering will be paid to horsemen's associations pursuant to agreement with racetrack.

55.    On December 10, 2018, the Senate Budget and Appropriations Committee held a hearing on Senate Bill 2992.

56.    During the hearing, representatives of FR Park Racing testified in opposition of Senate Bill 2992 on the grounds that the sharing of net revenues with the horsemen's associations was a "solution in search of a problem."

57.    Despite FR Park Racing's objections, on February 14, 2019, the Senate approved the amendment and directed that sums received by horse racing permit holders from sports wagering be shared with the horseman's associations pursuant to an agreement with the applicable

racetrack operator.

58.    Specifically, the amendment added N.J.S.A. 5:12A-16 to the Act, which provides that:

> The net revenues actually received by the horse racing permit holder from any sports wagering operation at the Freehold Raceway, including Internet wagering on sports events, either jointly established with a casino or established independently or with non-casino partners, less the total of all sums actually paid out for any operating expenses and as winnings to patrons, shall be paid by Freehold Raceway to the Standardbred Breeders and Owners' Association of New Jersey pursuant to the terms of a written agreement between Freehold Raceway and that association. A written agreement shall be in effect for as long as a sports wagering operation is conducted at Freehold Raceway.

59.    Therefore, as of February 14, 2019, the Act required that a written revenue sharing agreement be in place while sports wagering is conducted at Freehold Raceway.

60.    FR Park Racing, however, was slow in building-out its sports wagering offering and the sports wagering lounges. Both the Meadowlands and Monmouth Park opened years before FR Park Racing opened its sports wagering facility at Freehold Raceway.

61.    Despite receiving interim licensure from the New Jersey Racing Commission in 2018, FR Park Racing only opened a physical sportsbook at Freehold Raceway sometime in September 2020.

62.    The SBOANJ attempted to negotiate in good faith with FR Park Racing for a revenue sharing agreement as required by state law, but no revenue sharing agreement was in place for 2020, 2021 and 2022, in direct contravention of the statute since sports wagering was occurring at Freehold Raceway

63.    In December 2022, the SBOANJ circulated a draft Agreement for Sharing of Sports Betting Revenues (the "Revenue Sharing Agreement") to FR Park Racing for 2023.

64.     FR Park Racing did not respond to this draft until February 21, 2023.

65.     On March 23, 2023, the SBOANJ and FR Park Racing finally executed the Revenue Sharing Agreement.

66.     The Revenue Sharing Agreement was effective starting January 1, 2023 and ending on December 31, 2029, and is binding on any successor or assign to FR, GW, or Penn.

**C.      *FR Park Racing Develops its Online Skins, Fails to Pay SBOANJ its Share of the Revenue per the Revenue Sharing Agreement***

67.     FR Park Racing could never have developed any online sports wagering platforms unless it also operated a brick-and-mortar sports wagering lounge at Freehold Raceway—a provision intentionally designed by the Legislature to promote attendance at the racetracks and benefit the industry.

68.     In September 2020, Freehold began offering retail sports betting at Freehold Raceway and Parx was the branded name of the brick and mortar location.

69.     Because FR Park Racing maintained a brick and mortar sports wagering lounge, it was permitted to engage in online sports wagering operations at Freehold Raceway.

70.     FR Park Racing entered into agreements with Penn Entertainment ("Penn"); PlayUp Interactive Inc. ("PlayUp"); and GW to conduct internet sports betting at Freehold Raceway.  These online branded sportsbooks, known as "skins," operated pursuant to FR Park Racing's sports wagering license for Freehold Raceway.

71.     On October 7, 2020, FR Park Racing and PlayUp entered into an Interactive Operations Agreement (the "PlayUp Agreement") for PlayUp to conduct internet sports betting through its online branded sportsbook, also known as a skin, through the brick-and-mortar location of Freehold Raceway.

72.     The PlayUp Agreement provides that PlayUp must distribute revenue sharing

proceeds to FR Park Racing and that PlayUp shall provide FR Park Racing with a monthly operating statement related to the online sportsbook.

73.     In May 2023, two months after execution of the Revenue Sharing Agreement, the SBOANJ became aware that PlayUp had failed to remit funds to FR Park Racing, which in turn failed to make payment to SBOANJ's Purse Account.

74.     The Revenue Sharing Agreement intended for an equitable allocation of sports betting revenues among the three online skins.

75.     However, the Revenue Sharing Agreement also contemplates PlayUp's eventual default and treats PlayUp differently from the other two online skins.

76.     The Revenue Sharing Agreement further provides that FR Park Racing shall make a one-time deposit of funds, allocated among Penn, GW and PlayUp, which represents a percentage of retail and online gross gaming revenues.

77.     Lastly, the Revenue Sharing Agreement terminates in the event that FR Park Racing does not maintain a license to conduct retail and/or internet sports wagering.

78.     Thereafter, on May 25, 2023, FR Park Racing informed SBOANJ that it would distribute funds owed to the SBOANJ under the Revenue Sharing Agreement.

79.     FR Park Racing also stated that the SBOANJ is owed funds from PlayUp.

80.     On July 19, 2023, by Order 2577, DGE revoked all transactional waivers pertaining to PlayUp and PlayUp was not permitted, as of that date, to transact any sports wagering or internet gaming or conduct any related business in New Jersey.

81.     To date, PlayUp has not remitted any funds to FR Park Racing to satisfy its outstanding obligations to the SBOANJ.

82.     FR Park Racing has moved beyond not properly compensating the SBOANJ though

the Revenue Sharing Agreement, to now deducting revenue owed to the SBOANJ due to FR Park Racing's gaming losses.

83.     In January and February 2024, FR Park Racing reported losses from its sports betting operations, and did not remit any payments to the SBOANJ for those months. That comports with the Revenue Sharing Agreement, which only contemplates a sharing of gross gaming revenues.

84.     In subsequent months when FR Park Racing generated revenue from its sports betting operation, however, it deducted from the SBOANJ's revenue share a percentage of losses attributable to January and February 2024.

85.     Nowhere in the Revenue Sharing Agreement is the SBOANJ responsible for sharing in any losses generated by FR Park Racing.

86.     FR Park Racing violated the Revenue Sharing Agreement when it subsidized its own losses by deducting amounts properly owed to the SBOANJ.

**D.    *To Avoid Sharing Revenue with SBOANJ, FR Park Racing Attempts to Abandon the Brick-and-Mortar Sports Wagering Lounge at Freehold Raceway and Transfer its Online Platforms Outside of its Revenue Sharing Agreement with SBOANJ***

87.     Seeking to avoid its contractual obligations to the SBOANJ, FR Park Racing has declared its intention to abandon brick-and-mortar sports wagering license at Freehold Raceway and move the online operations to a new partner. This is a bad faith attempt to horde the revenue and not reinvest in Freehold Raceway's infrastructure or share the revenue with its industry partners, as was intended by the New Jersey Legislature.

88.     Even more egregious, FR Park Racing did not inform SBOANJ of its intended abandonment until just two weeks before sports wagering operations ceased at Freehold Raceway.

89.     The SBOANJ has already felt the detrimental effects of this action.  The DGE

website removed Freehold Raceway from the list of racetracks with sports wagering lounges and online sportsbooks, and FR Park Racing refuses to pay SBOANJ the money it is owed.

90.     FR Park Racing's bad acts are a blatant attempt to circumvent the letter and spirit of the Act by cutting the SBOANJ out of its share of revenue from sports wagering altogether.

91.     In late 2023, FR Park Racing began the process of rebranding its sportsbook to include internet sports wagering with the intent of ultimately closing down its brick-and-mortar retail sportsbook at Freehold Raceway.

92.     On August 8, 2023, ESPN announced an agreement with FR Park Racing's general partner (Penn) to launch ESPN BET, a branded sportsbook, that would include the "mobile app, website, and mobile website."

93.     On November 15, 2023, Penn released a statement that ESPN BET was "successfully launched in the 17 states across the U.S. where it offers online sports betting" and that Penn's online casino was also available within ESPN BET under the Hollywood Casino brand in several states including New Jersey.

94.     Upon information and belief, in early 2024, FR Park Racing informed DGE that it intended to surrender its retail sports wagering license.

95.     Without a retail sports wagering license, online sports wagering cannot be conducted at Freehold Raceway, pursuant to N.J.S.A. 5:12A-11(a).

96.     On July 17, 2024, representatives from FR Park Racing held a telephonic meeting with the SBOANJ's leadership where FR Park Racing notified the SBOANJ, for the first time, that it intended to surrender its retail sportsbook license to the DGE, effective just two weeks later on July 31, 2024.

97.     FR Park Racing also informed the SBOANJ that the three online skins would be

transferred to a casino in New Jersey and that the SBOANJ would receive no revenue from the skins after the surrender.

98.     On July 29, 2024, the SBOANJ sent a letter, through counsel, to DGE regarding FR Park Racing's proposed surrender and requesting relief.

99.     On August 5, 2024, DGE responded and noted that FR Park Racing ceased sports wagering operations at Freehold Raceway as of July 31, 2024, and that surrender of FR Park Racing's sports wagering license would not occur unless all statutory and regulatory requirements are met to the DGE's satisfaction.

100.    DGE also stated that the online sports wagering skins of GW NJ Sports and Penn, already completed their migration from Freehold Raceway to other partners.

101.    As of the filing of this complaint, DGE has not entered an order concerning FR Park Racing's surrender of its sports wagering license.

**E.      *FR Park Racing Announces That It Will Close All Operations at Freehold Raceway as of December 28, 2024, Before the Term of the Operations Agreement Expires***

102.    On September 19, 2024, FR Park Racing met with employees of Freehold Raceway to announce that will close down all operations at Freehold Raceway, effective December 28, 2024, despite the fact that the Operations Agreement is effective through June 30, 2025.

103.    The general manager of Freehold Raceway issued a press release on that same date stating "[u]nfortunately, the operations of the racetrack cannot continue under existing conditions, and we do not see a plausible way forward."

104.    The horse breeders and racers have been damaged by this announcement because they detrimentally relied on the 2025 race dates in making racing decisions this year.

105.    To that end, SBOANJ's members made investments in reliance on Standardbred

races occurring at Freehold Raceway.

106.    For example, the members bought and bred horses, signed vendor agreements (such as for training, stabling, medical care, veterinary care, etc.), and declined opportunities in other states based on the expectation and reliance of being able to race at Freehold Raceway.

107.    The members will also suffer lost revenue and purse money. Governor Murphy signed into law Assembly Bill 2610/Senate Bill 3203 on September 12, 2024, which extends a $1.6 million annual horse racing purse subsidy through State Fiscal Year 2029. See P.L. 2024, c. 76.  The Governor signed this bill one week prior to the announcement that Freehold Raceway will close.

108.    Freehold Raceway will be unjustly enriched in the current state fiscal year (SFY 2025) should it receive the annual purse subsidy prior to December 28, 2024, since it will obtain $1.6 million for overnight purses which cannot be used.

109.    The $1.6 million purse subsidy for subsequent state fiscal years (SFY 2026, 2027, 2028, and 2029), will now be forfeited due to closure of Freehold Raceway, and the horse racers and breeders will lose the opportunity to race for a chance to win this purse money.

110.    Closure of Freehold Raceway will also result in lost jobs as those in the industry, including those who manage the day-to-day operations at Freehold Raceway, will be laid off.

111.    Races have already been agreed to by the national Standardbred organization for racing to occur at Freehold Raceway in 2025, although official dates have not been set.

112.    Moreover, there were races every Friday and Saturday from January through June 2024, which amounts to 42 races. With every expectation of a similar schedule in 2025, the SBOANJ would have received hundreds of thousands of dollars pursuant to the Operations Agreement.  The SBOANJ will not be able to conduct these races, or receive any benefit from

them, due to closure of Freehold Raceway.

113.    Freehold Raceway was one of only two tracks in the state to conduct Standardbred racing.  Closing Freehold Raceway puts into question the future of the Standardbred industry in New Jersey.

## <u>COUNT I</u>
**(Breach of the Operations Agreement and Specific Performance Against FR Park Racing)**

114.    Plaintiff repeats and realleges each of the allegations of the above paragraphs as if set forth herein at length.

115.    The Operations Agreement constitutes a valid and binding agreement between SBOANJ and FR Park Racing.

116.    The Parties agreed that, upon written notice, FR Park Racing would remedy conditions at Freehold Raceway.

117.    FR Park Racing breached its agreement with the SBOANJ when it failed to timely fix the conditions at Freehold Raceway.

118.    For example, on January 13, 2023, the SBOANJ sent an e-mail to FR Park Racing stating that there was contamination in the horse stalls and requesting signs and a portable toilet in the Lasix Barn area to help alleviate the problem.

119.    The contamination in the stalls was due to patrons urinating in them, which obviously is a safety concern for both the individuals and the horses.  Such behavior is unacceptable and can simply be remedied by installing adequate signs and a portable toilet.

120.    FR Park Racing did not put the signs up nor install portable toilets until well after the 72 hour requirement in the Operations Agreement.

121.    Similarly on September 4, 2024, the SBOANJ sent an e-mail to FR Park Racing outlining certain conditions at Freehold Raceway that require attention.

122.    Specifically, the SBOANJ provided written notice of the following conditions at Freehold Raceway:

- Grandstand Area:
  - Main entrance sign still has Sportsbook on it;
  - Down Escalator now sealed off and broken for years needs to be fixed;
  - Route 33 street wall needs cleaning and painting;
  - Valet Parking Area sign states Lot Closed even though it was agreed on race day's that it would be opened from 11AM to 5PM;
  - Buildings outside and inside Valet area need cleaning and painting;
  - Garage doors need repair and painting;
  - All black top areas have grass growing and need removal; and
  - Car dealers continue to park inventory in parking lots.

- Paddock Area:
  - All parking areas and black top have grassing growing and need removal;
  - Photos show all barn and stall areas need repair and painting;
  - Parking areas need grass cut; and
  - General maintenance required in the paddock area.

123.    SBOANJ sent a follow-up email when FR Park Racing failed to respond.

124.    FR Park Racing breached the Operations Agreement by failing to address these items within 72 hours.

125.    FR Park Racing has left a number of safety issues unaddressed, including failing to maintain a working escalator, clean and safe garage areas and horse stalls, and having adequate bathrooms in the paddock area at Freehold Raceway.

126.    Freehold Raceway also boasts old signage with incorrect information, is in desperate need of a fresh coat of paint and overall cleaning service, and requires general maintenance to main areas of the facility including the paddock area parking lot and barn and stall areas, and in the grandstand area garage and main entrance.

127.    FR Park Racing's reluctance to maintain Freehold Raceway results in conditions that have depressed attendance, revenues, and profitability, thereby, harming the SBOANJ and its

members.

128.    As a result of Freehold's continued breach of the Operations Agreement, the SBOANJ has suffered damages.

WHEREFORE, the SBOANJ requests that judgment be entered in its favor and against FR Park Racing as follows:

a)    an order of specific performance requiring FR Park Racing to immediately fix all conditions at Freehold Raceway that the SBOANJ has provided written notice of on September 4, 2024;

b)    compensatory damages in an amount to be determined at trial, to include lost profits and revenues, along with interest and costs; and

c)    Any other relief this court deems just and proper.

## COUNT II
### (Anticipatory Breach of the Operations Agreement)

129.    Plaintiff repeats and realleges each of the allegations of the above paragraphs as if set forth herein at length.

130.    The Operations Agreement constitutes a valid and binding agreement between SBOANJ and FR Park Racing.

131.    The term of the Operations Agreement is December 22, 2022 through June 30, 2025.

132.    FR Park Racing is breaching the Operations Agreement by announcing that it will close down all operations at Freehold Raceway six months prior to the end of the term.

133.    FR Park Racing's announcement comes despite the fact that races have already been planned for the 2025 season.

134.    The SBOANJ will lose out on approximately 40 race dates due to this early termination.

135.    As a result of FR Park Racing's anticipated breach of the Operations Agreement, the SBOANJ and its members have suffered damages.

136.    Specifically, SBOANJ's members made investments in reliance on Standardbred races occurring at Freehold Raceway in 2025.

137.    For example, the members bought and bred horses, signed vendor agreements (such as for training, stabling, medical care, veterinary care, etc.), and declined other racing opportunities based on the expectation and reliance of being able to race at Freehold Raceway.

138.    The members will also suffer lost revenue and purse money. The Legislature and Governor of New Jersey are providing $1.6 million to Freehold Raceway in this current state fiscal year, and in future state fiscal years, for horse racing purse subsidies.

139.    Freehold Raceway will be unjustly enriched from its breach of the agreement should it receive the current year's racing subsidy prior to closure.

140.    This subsidy will also be forfeited in future years due to closure of Freehold Raceway, and the horse drivers' and breeders will lose the opportunity to race for a chance to win the purse money.

141.    Closure of Freehold Raceway will also result in lost jobs as those in the industry, including those who manage the day-to-day operations at Freehold Raceway, will be laid off.

WHEREFORE, the SBOANJ requests that judgment be entered in its favor and against FR Park Racing as follows:

a)  Compensatory and consequential damages in an amount to be determined at trial, to include lost profits and revenues, along with interest and costs;

b)  Temporary, preliminary, and permanent injunctive relief preventing FR Park Racing from obtaining any monetary benefit from the distribution of state-allocated horse racing purse subsidies pursuant to P.L. 2024, c. 76; and

c)  Any other relief this court deems just and proper.

## COUNT III
**(Breach of the Revenue Sharing Agreement and Injunction Against FR Park Racing)**

142.    Plaintiff repeats and realleges each of the allegations of the above paragraphs as if set forth herein at length.

143.    The Revenue Sharing Agreement constitutes a valid and binding agreement between SBOANJ and FR Park Racing, which required FR Park Racing to share revenues from sports betting at Freehold Raceway with the SBOANJ.

144.    FR Park Racing entered into agreements with GW, Penn, and PlayUp to conduct internet sports betting at Freehold Raceway via their online platforms through "skins" held by FR Park Racing.

145.    The skins held by FR Park Racing, through its partners GW, Penn, and PlayUp, were tied to Freehold Raceway and therefore, pursuant to N.J.S.A. 5:12A-16, the SBOANJ was entitled to revenue sharing from any revenue made from these online skins.

146.    On August 5, 2024 letter, DGE informed the SBOANJ that FR Park Racing transferred its online skins to FR Park Racing's other partners.  Those skins are now tied to a different retail location, despite the fact that DGE has entered an order concerning FR Park Racing's attempted surrender of its sports wagering license.

147.    The transfer of the skins to a different retail location is an attempt by FR Park Racing to evade its obligations to the SBOANJ and deepen its own pockets.  But for this transfer, the SBOANJ would be entitled to revenue sharing from these platforms, which were originally tied to Freehold Raceway's brick-and-mortar operation.

148.    Therefore, FR Park Racing breached the Revenue Sharing Agreement by migrating its three online skins to a different retail location to circumvent the requirement to make revenue

sharing payments to the SBOANJ.

149.    FR Park Racing breached the Revenue Sharing Agreement because FR Park Racing's attempt to surrender its retail sports wagering license *five years* before the expected termination renders the Revenue Sharing Agreement void.

150.    FR Park Racing breached the Revenue Sharing Agreement by failing to pay the SBOANJ the outstanding balance it is owed from the PlayUp skin. Upon information and belief, FR Park Racing has also failed to seek payment from PlayUp to satisfy its outstanding obligations to the SBOANJ.

151.    FR Park Racing breached the Revenue Sharing Agreement when it improperly deducted prior months gaming losses from amounts due to the SBOANJ in later months.

WHEREFORE, the SBOANJ requests that judgment be entered in its favor and against FR Park Racing as follows:

    a)   Temporary, preliminary, and permanent injunctive relief preventing FR Park Racing from distributing any funds from the online skins account, which the SBOANJ would otherwise be entitled, to GW and Penn as the owners of the skins;

    b)   Compensatory damages in an amount to be determined at trial, including but not limited to for lost revenue sharing payments from the premature migration of the skins to operate under a different license and amounts erroneously deducted for gaming losses; and

    c)   Any other relief this court deems just and proper.

## COUNT IV
### (Breach of Contract (Third Party Beneficiary) Against PlayUp)

152.    Plaintiff repeats and realleges each of the allegations of the above paragraphs as if set forth herein at length.

153.    The PlayUp Agreement is a valid and binding agreement between FR Park Racing and PlayUp.

154. The PlayUp Agreement specifically requires compliance with the State Gaming Law, which, in this context, is the Act.

155. N.J.S.A. 5:12A-16 requires, among other things, that

> The net revenues actually received by the horse racing permit holder from any sports wagering operation at the Freehold Raceway, including Internet wagering on sports events, either jointly established with a casino or established independently or with non-casino partners, less the total of all sums actually paid out for any operating expenses and as winnings to patrons, shall be paid by Freehold Raceway to the Standardbred Breeders and Owners' Association of New Jersey pursuant to the terms of a written agreement between Freehold Raceway and that association. A written agreement shall be in effect for as long as a sports wagering operation is conducted at Freehold Raceway.

156. The PlayUp Agreement provides that PlayUp must distribute revenue sharing proceeds to FR Park Racing.

157. PlayUp was on notice that, by complying with the Act, any revenue sharing payments made to FR Park Racing would be shared with the SBOANJ.

158. It was intended and foreseeable by both PlayUp and FR Park Racing that SBOANJ would be a third-party beneficiary to the PlayUp Agreement.

159. PlayUp breached its contract with FR Park Racing by failing to make revenue sharing payments.

160. PlayUp's breach resulted in damages to the SBOANJ, a third-party beneficiary of the contract.

161. As of May 2023, SBOANJ is owed funds due to PlayUp's breach.

WHEREFORE, the SBOANJ requests that judgment be entered in its favor and against FR Park Racing as follows:

a) Compensatory damages in an amount to be determined at trial, including but not limited to for lost revenue sharing payments from the premature migration of the skins to operate under a different license; and

b)  Any other relief this court deems just and proper.

## COUNT V
### (Breach of Contract – Breach of the Duty of Good Faith and Fair Dealing Against FR Park Racing)

162.    Plaintiff repeats and realleges each of the allegations of the above paragraphs as if set forth herein at length.

163.    The Revenue Sharing Agreement is a binding agreement between SBOANJ and FR Park Racing.

164.    Every agreement includes a duty of good faith and fair dealing which imposes obligations upon both parties, including the duty not to act to destroy the reasonable expectations of the other party regarding the benefits of the agreement.

165.    FR Park Racing breached its duty of good faith and fair dealing when it prematurely surrendered its retail sports wagering license, just one year into its seven year Revenue Sharing Agreement with SBOANJ.

166.    FR Park Racing breached its duty of good faith and fair dealing when it entered into the Revenue Sharing Agreement with SBOANJ on March 23, 2023, despite knowing that PlayUp had failed to remit payment to FR Park Racing to satisfy its revenue sharing obligations.

167.    FR Park Racing breached its duty of good faith and fair dealing when it failed to timely notify SBOANJ of its intended surrender of its sports wagering license.

168.    FR Park Racing's breach of the duty of good faith and fair dealing prevented SBOANJ from enjoying the intended benefits of the parties' agreement, including but not limited to revenue sharing from the three online skins for the remainder of the term of the agreement.

169.    The SBOANJ has suffered damages as a direct and proximate result of FR Park Racing's bad acts.

WHEREFORE, the SBOANJ requests that judgment be entered in its favor and against FR Park Racing as follows:

a) Temporary, preliminary, and permanent injunctive relief preventing FR Park Racing from distributing any funds from the online skins account, which the SBOANJ would otherwise be entitled, to GW and Penn as the owners of the skins;

b) Compensatory damages in an amount to be determined at trial, including but not limited to for lost revenue sharing payments from the premature migration of the skins to operate under a different license; and

c) Any other relief this court deems just and proper.

## COUNT VI
### (Demand for Accounting Against FR Park Racing)

170.    Plaintiff repeats and realleges each of the allegations of the above paragraphs as if set forth herein at length.

171.    The Operations Agreement provides that the SBOANJ shall be permitted to audit the Purse Account upon request to verify the accuracy of all deposits, debits, revenues, and expenses associated with the account.

WHEREFORE, pursuant to the Operations Agreement, the SBOANJ hereby demands an accounting of the Purse Account and all revenues related to sports wagering.

## COUNT VII
### (Demand for Accounting Against PlayUp)

172.    Plaintiff repeats and realleges each of the allegations of the above paragraphs as if set forth herein at length.

173.    The PlayUp Agreement requires that PlayUp shall provide FR Park Racing with a monthly operating statement related to the online sportsbook.

174.    PlayUp is also required to prepare and maintain accurate and complete books of accounts relating to its operations.

WHEREFORE, the SBOANJ, as a third-party beneficiary to the PlayUp Agreement, hereby demands an accounting of PlayUp's online sportsbook.

Dated:  September 27, 2024                    By:  */s/ Kevin W. Weber*
                                                  Kevin W. Weber
                                                  Michael D. DeLoreto
                                                  Julia E. Browning